UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

ANN R. FERRIS,                          CIVIL ACTION
        Appellant                       NO. CV08-0210-LC

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER         JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,                     MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


    Ann R. Ferris ("Ferris") filed an application for disability
insurance benefits ("DIB") on April 20, 2005, alleging a disability
onset date of March 11, 2004 (Tr. p. 61).  That application was
denied by the Social Security Administration ("SSA") (Tr. p. 55).

    A de novo hearing was held before an administrative law judge
("ALJ") on December 21, 2006, at which Ferris appeared with her
attorney, a witness, and a vocational expert ("VE") (Tr. p. 838).
The ALJ found that, although Ferris suffers from "severe"
degenerative disc disease in her lumbar spine with back surgeries
and a multi-level fusion (Tr. p. 14), she has the residual
functional capacity to perform light work except for work involving
climbing stairs and ramps, or which requires her to more than
occasionally balance, stoop, kneel, crouch, or crawl (Tr. p. 16).
The ALJ concluded that, since Ferris can perform her past relevant
work as an administrative assistant or a buyer's assistant (Tr. p.
19), she was not under a disability as defined by the Social

Security Act at any time through the date of his decision on July 26, 2007 (Tr. p. 20).

Ferris requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 4) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Ferris next filed this appeal for judicial review of the Commissioner's final decision. Ferris raises the following issues for review on appeal:

> 1. The ALJ committed legal error by failing to give the treating physician's opinions controlling or great weight.
>
> 2. The ALJ committed legal error by failing to give adequate reasons for his failure to give any weight to the opinions of the treating physician.
>
> 3. The ALJ committed legal error by imposing too high a standard on the credibility of Ferris and requiring her to be "entirely credible" contrary to regulations and case law.
>
> 4. The ALJ committed legal error by failing to consider the side effects of the medication taken by Ferris, although the VE stated that the effects described by Ferris would cause a significant problem for employers.

Ferris and the Commissioner filed briefs on appeal. Ferris' appeal is now before the court for consideration.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a

2

plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry

factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### Summary of Pertinent Facts

Ferris was 42 years old at the time of her December 2006 administrative hearing, had a high school degree and two years of college (Tr. pp. 841-842), and had past relevant work as an administrative assistant at an offshore construction business (1999-2004), an assistant buyer at an aircraft manufacturing business (1997-1999), an administrative assistant at an engineering company (1995-1997), and an administrative assistant at a rice mill (1984-1995) (Tr. p. 67).

### 1. Medical Records

Prior to March 2004, Ferris underwent unsuccessful conservative treatments for back pain, including oral steroids,

physical therapy, and lumbar epidural steroid injections (Tr. p. 704). In March 2004, Ferris was diagnosed with a herniated nucleus pulposus at L5-S1, from both clinical data and a surgical pathology report (Tr. p. 162). Dr. Erich Wolf, a neurosurgeon, diagnosed lumbar degenerative disc disease involving L3-4, L4-5, and L5-S1 (Tr. p. 704). Ferris underwent a left L51 METRx microdiskectomy in March 2004, which resolved her left L5 and S1 radicular pain, but two weeks later she had an episode of emesis (vomiting) and developed acute onset recurrent pain, again at left L5 and S1 (Tr. p. 704).

A repeat MRI demonstrated a recurrent left L5-S1 disc herniation, so in April 2004 Dr. Wolf repeated the left L5-S1 METRx microdiskectomy (Tr. pp. 361, 704). Ferris' radicular pain again resolved initially, but spontaneously returned two to three weeks later. Ferris reported that something in her lower back was "catching," she had a constant tingling sensation in her left posterior thigh, and she had an intermittent sharp burning pain in the plantar aspect of her left foot which worsened toward the end of the day (Tr. p. 705). X-rays did not show any segmental instability and there was no apparent recurrent disc herniation, but there was epidural fibrosis about the left S1 root (Tr. p. 705). Physical therapy was prescribed, and Ferris tried NSAIDs[1]

---

[1] NSAID is an acronym for "nonsteroidal anti-inflammatory drug," such as ibuprofen. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: "NSAID," *available at* http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va= NSAIDS (a service of the U.S. National Library of Medicine and the National Institutes of Health).

but tolerated them poorly; initial trigger point injections gave moderate temporary relief, but subsequent injections did not help (Tr. p. 705). Ferris had increasingly severe pain, particularly in a left sciatic distribution, but physical therapy combined with Medrol packs and lumbar traction improved her muscles, so over time her pain became more axial rather than appendicular (Tr. p. 705).

A discography was positive for concordant pain at L3-4, L4-5, and L5-S1, and by January 2005, over 80 percent of Ferris' pain was axial and mechanical (Tr. p. 705). Ferris' radicular pain improved but she continued to have axial, mechanical pain (Tr. p. 705). In June 2005, Ferris underwent a three-level fusion of the L3-4, L4-5, and L5-S1 (Tr. pp. 705, 766-768). Afterward, Ferris had much improved back pain and her radicular pain was resolved at two weeks post-op (Tr. p. 705). Ferris was weaned from her back brace after three months, and used narcotic analgesics and muscle relaxants for lumbar fatigue (Tr. p. 705). In September 2005, an x-ray of her Ferris' lumbar spine showed well-maintained disc spaces (Tr. p. 782).

Ferris had an orthopedic evaluation for physical therapy in January 2006, which showed that Ferris could not sit more than 30 minutes without excruciating pain before her third surgery, but Ferris' pain was improved after the surgery (Tr. p. 244). In July 2006, Ferris' physical therapist noted she had been progressing very well and continually improving, decreasing pain and increasing functional activity, mobility, and strength (Tr. p. 280). Ferris reported that, in the mornings, she decreased her pain to a

tolerable degree with exercise and movement, noting that walking helped decrease pain and loosen things up, was able to walk one-half mile per day without problem and sometimes walked two miles, was able to sweep at home, could go from sit to stand without a problem, and could stand for up to 30 minutes, but could not sit at a computer for 45 minutes (Tr. p 279).

Ferris continued to require narcotics and muscle relaxants along with physical therapy (Tr. p. 706). In July 2006, lumbar spine x-rays showed mature arthrodesis[2] of L4-5 and L5-S1, less robust at L3-4 (Tr. pp. 706, 781). Dr. Wolf's diagnosis was "post-laminectomy syndrome with sciatica and lumbago," noting that Ferris' symptoms were mechanical in nature and not adequately controlled (Tr. p. 706). Dr. Wolf stated that Ferris' activity level was sedentary (Tr. p. 706).

In October 2006 (Tr. pp. 44-46), Dr. Wolf again examined Ferris and noted increased pain and tenderness and muscle spasms in her lumbar spine, no left ankle reflex, positive straight leg raising on the left at 45 degrees, and sciatic notch tenderness on the left (Tr. p. 45). Dr. Wolf diagnosed left S1 radiculopathy, and stated Ferris could walk 1.5 miles slowly while wearing a back brace, and could sit up to thirty minutes before needing to recline

---

[2] Arthrodesis is another term for "spinal fusion." The outlook, or prognosis, for arthrodesis is that, while many patients have pain relief after surgery, the procedure is not always successful. Back pain sometimes returns, and more than hald of patients develop sciatica. MEDLINEplus Health Information, Medical Encyclopedia: Arthrodesis, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

or lie down for thirty minutes (Tr. p. 45).

In January 2007, Dr. Wolf stated that Ferris had failed aggressive conservative and surgical management of her degenerative disc disease and, consequently, was classified as having post-laminectomy syndrome (Tr. p. 837). Dr. Wolf stated that Ferris cannot lift, push, or pull more than ten pounds, must be able to change from sitting to supine as needed up to every thirty minutes, cannot bend, and cannot operate foot pedals (Tr. p. 837).

In February 2007, CT scans of Ferris' lumbar spine showed she was status post-fusion from L3 to S1 and the fused segments appeared to be solid, but there appeared to be a laminectomy defect on the left at the L5-S1 level with probably a small area of scar formation in that region (Tr. p. 796). Dr. Wolf examined Ferris and reviewed the MRI (Tr. pp. 805-807). Dr. Wolf noted Ferris' continued complaints of pain in her low back, left lower extremity, and left hip, the MRI showed Ferris' arthrodesis was mature at L4-5 and L5-S1, with a small gap across the arthrodesis at L3-4, and stated he did not believe the arthrodesis was responsible for her pain in the left lower extremity (Tr. pp. 806-807). Dr. Wolf recommended spinal cord stimulation with an implant, but noted that Ferris must await insurance eligibility (Tr. p. 807).

In July 2007, Dr. Wolf examined Ferris again and noted the increased severity (rated moderate to severe) of her left lumbar back pain and pain down her left leg to her foot, causing cramping in her toes and foot, and her increased need for pain medications (Tr. p. 790). Dr. Wolf found the pain interfered more with Ferris'

sleep, her mobility was worse, and she was unable to carry out her daily activities when the pain was present, which caused a very severe functional impairment (Tr. p. 790). Dr. Wolf found Ferris' left side strength was decreased and she had left hypoesthesia on the left in an S1 distribution at 20% of normal (Tr. p. 791). Dr. Wolf diagnosed post-laminectomy syndrome (Tr. p. 791).

2. December 2006 Administrative Hearing

Ferris appeared at the administrative hearing with her attorney, a witness, and a VE (Tr. p. 838). Ferris testified that she has a high school education and two years of college, is married, has a step-daughter under 18 years old, is able to drive but finds doing so uncomfortable, and lives in a house with her husband (Tr. pp. 841-842).

Ferris testified that she has not worked since March 11, 2004 (Tr. p. 843). Ferris testified that she first saw Dr. Wolf, her neurosurgeon, on December 19, 2003 (Tr. p. 857); she had two diskectomies in 2004 and a three level fusion in 2005 (Tr. pp. 843, 857). Ferris testified that her back hurts all the time, and pain radiates down her left leg to her foot about twice a week (Tr. p. 843). Ferris testified that, on a scale of one to ten, her average daily pain is 7/10, 5/10 on a good day, and 10/10 on a bad day, but most days her pain is 7/10 (Tr. pp. 843-844). Ferris further testified she has about five bad days a month, during which she takes a narcotic three or four times a day, and lies in bed on a heating pad or ice pack (Tr. p. 844). Ferris testified that she takes medication one or two times a day on an average day (Tr. pp.

9

844-845). Ferris takes Hydrocodone for pain and Methocarbamol, a muscle relaxer (Tr. p. 858). Ferris testified that her medication makes her feel sleepy and "kind of goofy" for one and a half to two hours after she takes it (Tr. p. 844). It takes thirty to forty-five minutes for Ferris' medication to decrease her pain in the mornings, and she has to wait until the medication takes effect before she can do anything (Tr. p. 862).

Ferris testified that physical therapy gave her relief from pain for two to four hours after each session, but the pain would return (Tr. p. 845). Ferris sees her doctor every one to three months for pain (Tr. p. 846). Ferris testified her doctor recommended an "electrode" "implant" in her spine to "calm" her pain, but she no longer has insurance to pay for it (Tr. p. 845).

Ferris testified that sitting or standing more than thirty to forty-five minutes makes her pain worse (Tr. p. 846). After she sits, she has to lie down for one to two hours (Tr. pp. 854-855). Ferris can walk about an hour, or a mile and a half, before she has to stop and take a break (Tr. p. 846). Ferris uses a walking stick when she walks (Tr. p. 846); the walking stick was not prescribed for her (Tr. p. 847). Ferris testified that she walks one and a half miles one to three times a week (Tr. p. 847). Ferris also testified that she still wears a back brace (Tr. p. 847). Ferris testified that her back feels best when she is laying down (Tr. p. 848).

Ferris testified that, on an average day, she sleeps four to five hours at night and is usually restless (Tr. p. 848). Ferris

takes medication to help her go to sleep every night (Tr. p. 848). Ferris falls asleep about 2:00 a.m. and gets up about 9:00 a.m. (Tr. p. 848). When she gets up, Ferris drinks coffee, reads the newspaper, and feeds her pets, then watches TV in a sitting position with her feet up (Tr. p. 849). Ferris testified that she is able to take care of her personal hygiene (Tr. p. 849). In the afternoons, Ferris watches movies, surfs the internet, talks on the telephone, reads, and naps (Tr. pp. 850-851). Ferris testified that she also does strengthening exercises for her abdominal muscles (Tr. p. 852). Ferris does not go to school, social, or church activities because she may be uncomfortable (Tr. p. 852).

Ferris further testified that she sits on a chair when she loads and unloads the dishwasher, she folds the laundry after her husband washes and dries it, and she does not vacuum, sweep, or mop; Ferris can grocery shop for about thirty minutes, but needs someone to assist her with large items (Tr. pp. 850-851, 866). Ferris testified that someone helps her with household chores, such as cleaning floors, dusting, and cleaning bathrooms (Tr. p. 867). Ferris testified that thirty minutes is the longest time she will ride in or drive a car (Tr. p. 864). Ferris has trouble getting in and out of her small car because it is very low to the ground, and she has problems turning around and looking over her shoulder (Tr. p. 866); she is more comfortable riding in her husband's full size truck (Tr. p. 867). Ferris also testified that she cannot eat at a dinner table, but has to eat sitting on a comfortable chair or her bed (Tr. p. 864).

Ferris testified that she can lift and carry up to about twelve pounds (Tr. p. 851), but does not do so every day (Tr. p. 865). Ferris testified the only ten to twelve pound thing she picks up is her dog, and her pain increases after she does so (Tr. p. 865). Ferris testified that she cannot pick something up off of the floor; instead, she kicks it over to a chair and sits in the chair to pick it up (Tr. p. 861). Ferris also cannot kneel down or climb stairs (Tr. p. 865).

Ferris testified that she awoke in excruciating one day last summer, but she does not know why, and her back has been noticeably worse since then (Tr. p. 859). Ferris testified that, before her pain increased, she was able to walk every day (Tr. p. 859), and she traveled to Houston and New Orleans to go to concerts, shopping, flea markets, and visiting friends (Tr. p. 868). Also, Ferris used to cook once a day, and now only cooks about twice a week (Tr. p. 869). Ferris testified that she now has constant pain in her lower left back, radiating down into her buttock (Tr. p. 860), which increases when she stands, sits, twists, or bends, and which is painful to the touch (Tr. pp. 860-861).

Ferris testified that she suffers from fatigue, probably due to her inability to sleep enough at night (Tr. pp. 861-862). Ferris testified that fatigue affects her mentally, causing her to be "foggy" (Tr. p. 862).

Ferris further testified that, since her former jobs as administrative assistant for an offshore company, assistant buyer for an aircraft manufacturing company, administrative assistant for

an engineering firm, and administrative assistant for a rice mill all involved several hours of sitting a day, she can no longer do those jobs (Tr. pp. 853-855). Ferris testified that sitting more than thirty to forty-five minutes makes her back start to spasm and causes unbearable pain (Tr. p. 863). Standing and walking after sitting makes her feel better but it doesn't relieve the pain (Tr. p. 864). Ferris testified that she cannot sit on a backless chair, or stool, and sometimes she needs help getting up out of a chair (Tr. p. 863). Ferris testified that, even if she were able to alternate sitting and standing, she would not be able to do any of her past jobs while standing up (Tr. p. 864).

Ferris' husband, Mike Ferris, also testified (Tr. p. 869). Mike testified that Ferris' testimony as her normal day was accurate (Tr. p. 869). Mike testified that he does ninety percent of the household chores (Tr. p. 870). Mike is a house painter, who works five days a week; since he works for himself, he is able to go home to check on his wife or call her (Tr. p. 870). Mike testified that he and Ferris seldom go out to eat, and when they do, they always get take-out food (Tr. p. 871). Mike testified that he and Ferris are not able to sleep in the same bed because he is on 24 hour call for work, while Ferris turns over a lot, so they make each other miserable (Tr. p. 871).

The VE testified that Ferris' past relevant work as an administrative assistant was sedentary, skilled work (Tr. p. 872), and that Ferris' past relevant work as an assistant buyer was sedentary, semi-skilled work (Tr. p. 872).

The ALJ posed a hypothetical question to the VE, involving an individual of the same age, education, and work experience as Ferris, who can lift ten pounds frequently and twenty pounds occasionally, can stand or walk for six hours, and can occasionally climb, work around ropes, ladders or scaffolds, balance, stoop, kneel, crouch, or crawl (Tr. p. 873). The VE testified that such a person could perform Ferris' past relevant work (Tr. p. 873).

The ALJ posed a second hypothetical to the VE, involving a person of Ferris' age, education, and work experience, who can lift less than ten pounds frequently and up to ten pounds occasionally, stand and walk only two hours, sit for up to six hours with alternating sitting and standing at thirty to forty-five minute intervals, cannot climb or work around ropes, ladders and scaffolds, and can only occasionally balance, stoop, kneel, crouch, and crawl (Tr. p. 873). The VE testified that such a person could perform Ferris' past relevant work, either as traditionally performed (as described in The Dictionary of Occupational Titles) or with some modifications of the way she actually performed her jobs (Tr. p. 873). The VE further testified that the person described in the second hypothetical question could also work as a receptionist or information clerk (sedentary work, 14000 jobs in Louisiana and 1.1 million nationally), or as an office clerk, including correction, payroll and timekeeping clerks (sedentary work, 1900 jobs in Louisiana and 171,000 nationally) (Tr. pp. 873-874).

The ALJ posed a third hypothetical question which assumed the

14

same person described in the second hypothetical with the addition that, because of pain and medication side-effects, the person can only attend and concentrate for two-thirds of a working day (Tr. p. 875). The VE testified there are no jobs that such a person can perform (Tr. pp. 874-875).

The VE also testified that, if the individual has to lie down after sitting for thirty to forty-five minutes, there are no jobs that person can perform (Tr. p. 875). The VE testified that if the person has to take pain medication during the day, and the medication causes confusion and an inability to focus, an employer would not tolerate that and would not retain such an employee (Tr. p. 876). Finally, the VE testified that, if the individual were late for work five times a month due to a high level of pain and waiting for her pain medication to take effect, her employer would not retain her very long (Tr. p. 880).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Ferris (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not

disabled at any point in the five-step review is conclusive and terminates the analysis. <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. <u>Greenspan</u>, 38 F.3d at 237.

In the case at bar, the ALJ found that Ferris has not engaged in substantial gainful activity since March 11, 2004, and that she has severe impairments of degenerative disc disease in her lumbar spine, with back surgeries and a multi-level fusion (Tr. p. 14), but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 16). The ALJ then found that, as of July 26, 2007, Ferris was still able to perform her past relevant work as an administrative assistant or a buyer's assistant (Tr. pp. 19-20). The sequential analysis thus ended at Step 4, with a finding that Ferris was not disabled (Tr. p. 20).

Issues 1 and 2 - Treating Physician

Ferris contends the ALJ committed legal error by failing to give the treating physician's opinions controlling or great weight,

16

and by failing to give adequate reasons for his failure to give any weight to the opinions of the treating physician. Specifically, Ferris argues that, instead of adopting Dr. Wolf's assessment as to Ferris' residual functional capacity, the ALJ adopted the conclusions of Dr. Gerald Dzurik, a pediatrician who did not examine Ferris, but evaluated her residual functional capacity after reviewing her medical records. The ALJ discredited Dr. Wolf's assessment because it was based on Ferris' subjective reports of pain, rather than on observable evidence (Tr. p. 17).

The treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined the applicant, or when the consulting physician examined the applicant only on a "one-shot" basis. Bowman v. Heckler, 706 F.2d 564, 568 (5th Cir. 1984), citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981), and cases cited therein; Warncke v. Harris, 619 F.2d 412, 416 (5th Cir. 1980); Strickland v. Harris, 615 F.2d 1103, 1109-1110 (5th Cir. 1980); Williams v. Finch, 440 F.2d 613, 616-17 & n. 6 (5th Cir. 1971). Also, Carry v. Heckler, 750 F.2d 479, 484 (5th Cir. 1985). However, the weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. Elzy v. Railroad Retirement Board, 782 F.2d 1223, 1225 (5th Cir. 1986); Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983).

In Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001), the Fifth Circuit stated it has long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is

17

familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability. However, the opinion of the treating physician is not conclusive and the ALJ must decide the claimant's status. Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the treating physician's testimony. The good cause exceptions recognized by the Fifth Circuit include disregarding statements that are brief, conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. An ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. Myers, 238 F.3d at 621, citing Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).

In the case at bar, the ALJ stated in his decision (Tr. pp. 17-18):

> "I do not agree with Dr. Wolf's evaluations, and do not credit them. I note that Dr. Wolf's evaluations depend on the claimant's reports of her pain, and so are subject to the same evaluation as I make of the claimant's symptoms. At Dr. Wolf's last examination of the claimant, in June 2006, there was no observable evidence of her reported pain - her muscle mass, and tone and strength, were all normal in her lower extremities, as were he reflexes (Exh. 7F-40). And the physical examination showed only tenderness in the lumbar spine, at midline, at L2 and L3, which Dr. Wolf rated at moderate (Exh. 7F-40). Dr. Wolf made no mention of pain in or near the claimant's lower back, such as lumbago or sciatica, nor did he mention the claimant complaining of any such pain. I consider Dr. Wolf's evaluation of the claimant's residual functional capacity and her ability to sustain work and her ability

to return to work not supported by his own contemporaneously made medical records.

           *           *           *

"And even Dr. Wolf describes the claimant's radicular symptoms being relieved, greatly if not entirely, with her eventual pains, after all her surgeries, as being mechanical and axial. But, as noted above, the medical evidence, specifically the contemporaneously made notes b Dr. Wolf, do not support his later reports of lumbago and sciatica - the contemporaneously made records do not even show those as diagnoses."

First, it is noted the ALJ erred in stating Dr. Wolf's last examination of Ferris was in June 2006. In fact, he examined Ferris October 2006, February, 2007, and July 2007. In October 2006, Dr. Wolf noted Ferris' increased pain and tenderness and muscle spasms in her lumbar spine, no left ankle reflex, positive straight leg raising on the left at 45 degrees, and sciatic notch tenderness on the left, and diagnosed left S1 radiculopathy (Tr. p. 45). In February 2007, Dr. Wolf noted that there appeared to be a laminectomy defect on the left at the L5-S1 level with probably a small area of scar formation in that region, and recommended spinal cord stimulation for Ferris' pain (Tr. p. 796). In July 2007, Dr. Wolf found Ferris' pain was increased, her left side strength was decreased, and she had left hypoesthesia on the left in an S1 distribution at 20% of normal (Tr. p. 791). Dr. Wolf diagnosed post-laminectomy syndrome (Tr. p. 791). Therefore, the ALJ's reasoning for rejecting Dr. Wolf's assessment of Ferris' residual functional capacity, as unsupported by medical evidence, is not valid.

Second, the treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined

the applicant. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir.1981); Warncke v. Harris, 619 F.2d 412, 416 (5th Cir.1980); Strickland v. Harris, 615 F.2d 1103, 1109-1110 (5th Cir.1980). In situations where there are conflicting medical opinions as to the extent or severity of a claimant's impairment, the opinion of the treating physician, absent special circumstances, should prevail. Only where there are serious questions as to: 1) the treating physician's qualifications, 2) the nature or duration of his relationship to the claimant, or 3) the sufficiency of the treating physician's medical data, would a different result lie. King, 742 F.2d at 973; Montijo v. Secretary of Health and Human Services, 729 F.2d 599, 602 (9th Cir.1984). Also, Samuels v. Heckler, 668 F.Supp. 656, 661-662 (). The opinion of a non-examining physician, on the other hand, "is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir.1987) (citation omitted).

Dr. Wolf was Ferris' treating neurosurgeon for several years, he performed all of her surgeries, and his opinion as to the specific aspects of Ferris' residual functional capacity was supported by the medical records. Dr. Dzurik, a pediatrician, rendered his opinion based on a review of Ferris' medical records. The ALJ erred in accepting the opinion of a non-examining consultant over the well-supported opinion of the treating surgeon. Compare, Green v. Commissioner of Social Sec., 2001 WL 364921, *4 n.20 (E.D.La.) ("The fact that the record also contained a conflicting opinion by a non-examining doctor whose services were

20

retained by the DDS is insufficient to justify deviation from the Regulation's clear mandate that the opinion of the treating physician be given controlling, or at a minimum, substantial weight.").

Moreover, Dr. Wolf's last evaluations of Ferris' residual functional capacity was made in February and July of 2007. However, Dr. Dzurik's evaluation was made on June 2, 2005 (Tr. pp. 165-172), and thus pre-dated Ferris' third surgery, which was on June 29, 2005 (Tr. p. 705). Clearly, Dr. Dzurik's evaluation was outdated and should never have been relied on by the ALJ to establish Ferris' residual functional capacity in 2007.

Third, as a pediatrician, Dr. Dzurik's opinion as to Ferris' back problems and post-surgery status was outside of the area of his expertise, whereas Dr. Wolf is a neurosurgeon. The weight to be accorded a medical expert's opinion depends on a number of factors, including: length of treatment relationship, nature and extent of treatment relationship, the existence of relevant evidence to support the opinion, the consistency of the opinion with the record as a whole, and *the area of expertise or specialty* of the treating source. 20 C.F.R. § 404.1527. Therefore, the ALJ should not have accepted Dr. Dzurik's opinion over Dr. Wolf's.

Finally, by contradicting Dr. Wolf's diagnosis of sciatica and lumbago, the ALJ also stepped outside the area of his expertise. ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments. <u>Frank v. Barnhart</u>, 326 F.3d 618 (5th Cir. 2002). Since there was no medical

evidence contradicting Dr. Wolf's well-supported diagnosis, the ALJ erred in failing to accept it.

Therefore, substantial evidence does not support the ALJ's/Commissioner's findings that Ferris has the residual functional capacity to perform her past relevant work.

## Issue 3 - Credibility Standard

Ferris also contends the ALJ committed legal error by imposing too high a standard on the credibility of Ferris and requiring her to be "entirely credible" contrary to regulations and case law.

The ALJ stated, in his decision as to her residual functional capacity, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. p. 19). Ferris appears to contend the ALJ held her to a standard of being "entirely credible." However, the ALJ's statement actually appears to mean that he found points in Ferris' testimony that were not credible, as set forth in his decision. Therefore, the ALJ did not apply an incorrect legal standard to his credibility determination as alleged by Ferris.

## Issue 4 - Medication Side Effects

Ferris argues the ALJ committed legal error by failing to consider the side effects of her medication, although the VE stated that the effects described by Ferris would cause a significant problem for employers.

The regulations applicable to the Social Security Act establish that the ALJ must consider medication side effects when evaluating a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv).

In the case at bar, the ALJ failed to mention the side effects of Ferris' medications. Instead, the ALJ stated in his decision that Ferris takes her medications, Hydrocodone and Methocarbamol, when she has "bad" days, which are about five times a month. However, Ferris never testified that she takes medication *only* on her bad days. Ferris testified at her hearing that, on bad days, she takes her pain medication three or four times day and uses hot and cold packs, and on average days she takes her pain medication once or twice a day (Tr. pp. 844-845). Ferris also stated, in her application, that she uses a back brace and a TENS machine daily (Tr. p. 81).

Ferris testified at her hearing that her medication makes her feel sleepy and "kind of goofy" for one and a half to two hours after she takes it. The VE testified these medication side effects would make Ferris confused and unable to focus or concentrate, which employers would not tolerate, so Ferris would have a problem retaining a job (Tr. p. 876).

The ALJ clearly erred in failing to consider Ferris medication side effects when evaluating her residual functional capacity, and in incorrectly stating Ferris only takes medication about five days a month. Therefore, substantial evidence does not support the ALJ's/Commissioner's finding that Ferris has the residual functional capacity to perform sedentary work and their conclusion that Ferris can still perform her past relevant work.

Since substantial evidence does not support the conclusions of the ALJ and the Commissioner, their decision is incorrect as a

matter of law. However, this does not entitle Ferris to a decision in her favor based upon the existing record. The record is simply inconclusive as to whether Ferris can perform her past relevant work and as to whether there are any jobs existing in sufficient numbers in the national economy which Ferris can perform, given her true impairments and residual functional capacity. Therefore, Ferris' case should be remanded to the Commissioner for further proceedings.

## Motion for Remand

Ferris also filed a motion for remand due to "new evidence," which is attached to the motion. That evidence was not considered by the undersigned since it is clear the case should be remanded, anyway. The "new evidence," a July 2007 residual functional capacity assessment by Dr. Wolf, can be considered by the SSA on remand.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Ferris' case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District

Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 8th day of October, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE